# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEIL BIDON, | ) | CASE NO. 3:22-CV-00590 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOUGLAS COLLINS,[1] | ) | March 27, 2025 |
| *Secretary of Department of Veterans* | ) | |
| *Affairs,* | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OF DECISION
### RE: MOTION FOR SUMMARY JUDGMENT (ECF NO. 26)

Kari A. Dooley, United States District Judge:

Plaintiff Neil Bidon ("Plaintiff" or "Bidon") brings this employment discrimination action *pro se* against Defendant Douglas Collins ("Defendant") in his capacity as the Secretary of Department of Veterans Affairs. Plaintiff, who is Filipino, alleges that he was discriminated against based on his national origin when he was disciplined several times and eventually suspended. Defendant filed a motion for summary judgment on all counts, which Plaintiff opposes. For the reasons that follow, Defendant's motion is GRANTED.

**Standard of Review**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury

---

[1] Plaintiff commenced this action against Denis McDonough, as Secretary of the Department of Veterans Affairs, on April 25, 2022. On February 5, 2025, Douglas Collins was sworn in as the Secretary of Veterans Affairs. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Douglas Collins is automatically substituted for Denis McDonough as the named defendant. The Clerk of the Court is directed to amend the caption in this case accordingly.

could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Which facts are material is determined by the substantive law.  *Anderson*, 477 U.S. at 248.  "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . ."  *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).  In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must set forth "specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  He cannot "rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted).  Nor can he rely on "mere speculation or conjecture as to the true nature of the facts."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation omitted).  To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not

overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts and Procedural History[2]**

The relevant facts are taken from Defendant's Local Rule 56(a)(1) Statement ("Def.'s 56(a)"), ECF No. 27, and attached exhibits, ECF Nos. 27-1 to 27-26; Plaintiff's Local Rule 56(a)(2) Counterstatement ("Pl.'s 56(a)"), ECF No. 30, at pp. 1–20, and attached exhibits, ECF No. 30, at pp. 32–199; Plaintiff's Additional Material Facts ("Pl.'s 56(a) AMF"), ECF No. 30, at pp. 21–31; and Defendant's Local Rule 56(a)(2) Counterstatement to Plaintiff's Additional Material Facts ("Def.'s 56(a) AMF"), ECF  No. 32.  All the facts set forth herein are undisputed unless otherwise indicated.

Plaintiff Neil Bidon is of Filipino descent, and he began working as a registered nurse at the West Haven VA Medical Center on January 7, 2008.  Pl.'s 56(a) AMF ¶¶ 1–2.  In 2020 and 2021, the time relevant to the Complaint, Bidon worked in the Surgical Intensive Care Unit ("SICU").  Def.'s 56(a) ¶ 2.  Bidon's first-line supervisor was Frank Maglione ("Maglione"), and Anna Marie Noyes ("Noyes") was his second-line supervisor.  *Id.* ¶¶ 3–4.  Cheyanne Wirtz ("Wirtz"), Carmen LeFranc ("LeFranc"), and Rogehni Munoz ("Munoz") were all nurses in the SICU.  *Id.* ¶¶ 13, 24.  In April 2020, Dr. Bernadette Jao ("Dr. Jao"), who is also of Filipino

---

[2] Defendant properly informed Plaintiff of his obligation to respond to the Motion for Summary Judgment and the contents of a proper response.  *See* Def.'s Certificate of Service of *Pro Se* Notice and Summary Judgment Filing, ECF No. 28.  But although Plaintiff filed a Rule 56(a)(2) counterstatement, he did not file a separate memorandum of law in opposition to Defendant's motion, in compliance with Local Rule 7(a)(2).  Instead, Plaintiff included some of his legal arguments in his counterstatement, which is impermissible.  *See Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257, 270 (D. Conn. 2021).  These impermissible arguments are not a substitute for a memorandum of law.  *See Dipippa v. Fulbrook Cap. Mgmt., LLC*, No. 3:19-MC-32 (KAD), 2019 WL 8331426, at *1 (D. Conn. Aug. 29, 2019).  Notwithstanding, in reaching its decision, the Court has considered the entirety of Plaintiff's submission, to afford him the appropriate solicitude as a *pro se* litigant.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006).  However, the Court cannot make Plaintiff's legal arguments for him; it can only assess the factual record and the arguments presented to it.  *See id.* at 477 n.6 ("[W]hile the court 'is not to become an advocate' for a *pro se* litigant, it must 'take appropriate measures to permit the adjudication of *pro se* claims on the merits[.]" (quoting *Donald v. Cook Cnty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996))).

ancestry, was hired as the new Associate Director for Patient Care Services, which was a supervisory position above Maglione and Noyes. *Id.* ¶ 9.

In May 2020, an investigation was opened by Maglione into a medication discrepancy linked to Bidon's file. *Id.* ¶ 5. Bidon used a "medication override" to obtain three vials of a controlled narcotic, but the system later showed that he only gave the patient one vial. *Id.* ¶ 4. During the investigation, Bidon claimed that this discrepancy was due to a computer glitch, and he disputes that Maglione had discussed with members of IT whether a glitch was a potential explanation. *Id.* ¶ 6; Pl.'s 56(a) ¶ 6. Regardless, Maglione concluded that a doctor had verbally ordered Bidon to withdraw three vials, but Bidon had failed to document this order properly. Def.'s 56(a) ¶ 7. Maglione issued Bidon a proposed letter of reprimand on June 22, 2020, and Noyes upheld the reprimand on July 15, 2020. *Id.* ¶ 8.

**July 16, 2020: Filipino Cultural Party**

After Dr. Jao joined the staff at the medical center, Bidon proposed throwing a Filipino cultural party, to both welcome Dr. Jao to the staff and celebrate Filipino culture. *Id.* ¶ 10. On June 30, 2020, Bidon sent an email to several department supervisors titled, "Filipino Culture Celebration: A culinary experience." *Id.* ¶ 12. Plaintiff alleges that he intended the party to be open to all staff members of the medical center, and that he sent out invitations to multiple non-Filipino employees. Pl.'s 56(a) AMF ¶¶ 19–20; Pl.'s 56(a) ¶ 13. However, multiple other staff members, including Maglione, Noyes, Wirtz, and LeFranc, later testified that they and others perceived that the party was exclusive to Filipino staff. Def.'s 56(a) ¶ 13. Maglione did not publicly comment about the party at the time. *Id.* ¶¶ 23, 25. During a conversation with Munoz on June 29, 2020, Noyes expressed her opinion that she thought the party "didn't seem like a good idea." *Id.* ¶¶ 23–24; Noyes Aff., ECF No. 27-17, ¶ 3. Plaintiff alleges that this was because Noyes

harbored animus towards him for his Filipino heritage, but Noyes contends that it was because of her discomfort with the fact that the party seemed exclusive to Filipinos. Pl.'s 56(a) AMF ¶¶ 25–27; Noyes Aff. ¶ 3. Plaintiff claims that Noyes asked Munoz to tell him to cancel the party, although Noyes denied this. Pl.'s 56(a) AMF ¶ 26; Noyes Aff. ¶ 3. Noyes also reportedly had an "expression of dislike" on her face when discussing the party with Munoz. Pl.'s 56(a) AMF ¶ 24.

After the party was held on July 16, 2020, which neither Noyes nor Maglione attended, Pl.'s 56(a) AMF ¶ 31, several confrontations occurred. First, on August 9, 2020, Wirtz confronted Bidon about how many non-Filipino nurses, including her, were upset by the perceived exclusivity of the party. Def.'s 56(a) ¶ 19. Plaintiff characterized this interaction as "verbal harassment" by Wirtz, in which she called him a "kiss ass" with management. Pl.'s 56(a) ¶ 19. Later, on August 13, 2020, Dr. Jao showed up at a routine SICU staff meeting to address any lingering concerns about the party with staff. Def.'s 56(a) ¶ 20. Both Dr. Jao and LeFranc explained during the meeting that they perceived the party to be exclusive, and that this was uncomfortable for them. *Id.* ¶ 21. Plaintiff concedes that he never spoke to Maglione or Noyes about the cultural party. Pl.'s 56(a) ¶ 26. Plaintiff also alleges that following the cultural party, Noyes would "frequently cast rude, spiteful, and demeaning looks at Plaintiff," and she has "exuded a dismissive attitude toward Plaintiff." Pl.'s 56(a) AMF ¶ 65.

**August 13, 2020: Patient Mistreatment Incident**

Later in the day on August 13, 2020, a patient made a complaint against Bidon for mistreating him. Def.'s 56(a) ¶ 27. Maglione met with the patient, who was "basically in tears," investigated the incident, and gathered sworn witness statements. *Id.* ¶ 28. The patient alleged that while Bidon was treating him with barium in preparation for a CT scan, the patient began to feel sick and vomit, but Bidon allegedly did not stop the treatment and asked the patient "are you

nauseous?" in a purportedly sarcastic tone. *Id.* ¶ 29. The patient also alleged that Bidon dropped an IV pump twice on the patient's lap, resulting in pain because the patient had an incision and drain on his abdomen. *Id.* ¶ 30. Plaintiff denied much of the allegations when Maglione met with him and his union representative during the fact-finding investigation. *Id.* ¶ 32.

On August 13, 2020, the same day as the complaint was made, Bidon was ordered to immediately cease direct patient care, pending the investigation by Maglione. *Id.* ¶ 31. Bidon was temporarily reassigned to the Telemetry Unit, which was overseen by a nurse manager named Marie Mann ("Mann"). *Id.* ¶ 39. Between August 24 and August 27, Bidon submitted his proposed work schedule for the week of September 13, 2020, to Mann for approval. *Id.* ¶ 41. This proposed schedule did not meet the usual requirements for someone who was under administrative review, as they are only supposed to work during the administrative workweek. *Id.* ¶ 40. Mann informed Bidon that the proposed schedule was unacceptable; she testified later that she had one in-person confrontation with Bidon about this, which Plaintiff characterizes as verbal harassment, and that she "scream[ed] at his face." *Id.* ¶¶ 42–43; Pl.'s 56(a) ¶ 43.

Later, Maglione completed his fact-finding investigation into the patient incident, and he ultimately credited the patient's account of events over Bidon's. Def.'s 56(a) ¶ 33. On November 20, 2020, Plaintiff received a proposed seven-day unpaid suspension for the incident. *Id.* ¶ 34; Def.'s Ex. 10, ECF No. 27-10, at 2–5. This proposed disciplinary letter was amended on December 18, 2020, Def.'s Ex. 10, at 6–12, and upheld by the director of the medical center, Alfred Montoya ("Montoya"), on January 12, 2021. *Id.* at 13–15. However, the suspension was later lowered to a three-day unpaid suspension. *Id.* Bidon served the three-day suspension on January 21, 2021, February 4, 2021, and February 16, 2021. Def.'s 56(a) ¶ 34.

**Other Allegations**

On October 19, 2020, Bidon received his usual proficiency report from Maglione. *Id.* ¶ 47. He received an overall rating of "satisfactory," but in the subcategory of "interpersonal relationships," he was rated as "low satisfactory," which was lower than in prior years. *Id.* ¶¶ 47–48. Maglione testified that the reason he gave this rating was because of both the April 5, 2020 medication incident and the August 13, 2020 patient mistreatment incident, in which Bidon "owned up to nothing and denied doing anything wrong." *Id.* ¶ 48. Plaintiff claims that at a meeting with Maglione about his proficiency report, Maglione asked, "You know exactly what happened to your party, right?" Pl.'s 56(a) ¶ 49. Maglione denies having said this. Def.'s 56(a) ¶ 49.

On October 30, 2020, Bidon contacted his Equal Employment Opportunity ("EEO") counselor. *Id.* ¶ 61. As a result of the allegedly hostile work environment described in the Complaint, Bidon eventually resigned from the medical center on July 6, 2021. *Id.* ¶ 68.

Plaintiff filed the Complaint on April 5, 2022. ECF No. 1. Defendant filed an answer on October 11, 2022. ECF No. 16. After discovery was complete, Defendant filed the present motion for summary judgment on April 1, 2024, ECF No. 26, which Plaintiff opposes, ECF No. 30.

**Discussion**

    I.    <u>Count 1: Substantive Discrimination</u>

In Count 1 of the Complaint, Plaintiff alleges discriminatory treatment on account of his national origin in violation of Title VII.

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . .

national origin." 42 U.S.C. § 2000e-2(a)(1).  Discrimination claims under Title VII are analyzed

using the *McDonnell-Douglas* burden-shifting framework.  *See McPherson v. N.Y.C. Dep't of

Educ.*, 457 F.3d 211, 215 (2d Cir. 2006).  The *McDonnell-Douglas* test proceeds as follows: (1)

the plaintiff "bears the minimal burden of setting out a *prima facie* discrimination case," (2) if the

plaintiff satisfies their burden, the plaintiff "is then aided by a presumption of discrimination unless

the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action,"

and (3) if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption

evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for

discrimination." *Id.* (internal quotation marks and citations omitted).

To establish a *prima facie* discrimination case, plaintiff must show: (1) "he belonged to a

protected class," (2) "he was qualified for the position," (3) "he suffered an adverse employment

action," and (4) "the adverse employment action occurred under circumstances giving rise to an

inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)

(internal quotation marks and citations omitted).  If a plaintiff does not have direct evidence of

discriminatory intent, plaintiff may present evidence of disparate treatment, such as evidence that

his employer treated him less favorably than similarly situated employees outside of his protected

class, to support an inference of discriminatory intent.  *See Bentley v. AutoZoners, LLC*, 935 F.3d

76, 89–90 (2d Cir. 2019).

### A.    Discriminatory Acts Taking Place Before September 15, 2020

As a threshold matter, Defendant first argues that much of the allegedly discriminatory

conduct in the Complaint is not actionable because it is time-barred: "the Court should disregard

as time-barred any allegedly discriminatory acts occurring prior to September 15, 2020, given that

Plaintiff only first contacted an EEO counselor on October 30, 2020." Def.'s Mem. of Law, ECF No. 26, at 14.

Title VII is "the exclusive remedy available to federal employees who allege employment discrimination." *Wilder v. U.S. Dep't of Veterans Affs.*, 175 F. Supp. 3d 82, 88 (S.D.N.Y. 2016) (quotation omitted). But before a federal employee can bring a Title VII claim against his employer, he must first exhaust his administrative remedies. 42 U.S.C. § 2000e-16(c); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Mathirampuzha*, 548 F.3d at 74. The requirements themselves are set forth in the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC"). *See Green v. Brennan*, 578 U.S. 547, 552–53 (2016). As relevant here,

> [t]imely exhaustion of administrative remedies requires that a federal employee comply with applicable EEOC regulations. Under these regulations, a government employee seeking to bring an employment discrimination claim must first . . . . consult with a counselor at the relevant agency's Equal Employment Office ("EEO") within 45 days of the alleged discriminatory act . . . .

*Wilder*, 175 F. Supp. 3d at 88–89 (quotations, citations, and alterations omitted). "The 45-day period serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001).[3]

There is an exception to this, however. "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."

---

[3] "Although *pro se* litigants are usually offered [latitude], when it comes to statutory filing deadlines courts have consistently held that even *pro se* plaintiffs must be held to strict compliance" with exhaustion requirements. *Pryor v. Nat'l Grid*, No. 10-CV-6507 (PAC) (THK), 2011 WL 3251571, at *2 (S.D.N.Y. July 28, 2011).

*Patterson v. Oneida County*, 375 F.3d 206, 220 (2d Cir. 2004). However, the continuing violation doctrine typically does not apply to "discrete discriminatory acts," which "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. A discrete discriminatory act is a "single completed action" that occurs at a specific time, and typically is actionable on its own. *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003). The Supreme Court has identified "termination, failure to promote, denial of transfer, or refusal to hire" as examples of discrete acts, each of which "starts a new clock for filing charges." *Morgan*, 536 U.S. at 113–14. "[C]ourts in this circuit disfavor application of the continuing violations doctrine and hold that only compelling circumstances warrant use of this exception to the statute of limitations." *Ravenscroft v. Williams Scotsman, Inc.*, No. 3:14-CV-870 (MPS), 2015 WL 1311332, at *3 (D. Conn. Mar. 23, 2015) (quotation omitted) (collecting cases); *see also Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 444 (S.D.N.Y. 2023) (quotation omitted) ("[I]n the Second Circuit, the continuing violations doctrine is disfavored outside of a hostile work environment situation, and should only be applied in compelling circumstances.").

Defendant contends that the allegedly discriminatory acts that took place before September 15, 2020—to wit, the reprimand resulting from the medication documentation error on April 5, 2020, and the disciplinary actions taken in the immediate aftermath of the patient mistreatment incident on August 13, 2020—constitute "discrete acts," which started new clocks for filing charges, and thus, are time-barred under *Morgan*. The Court agrees. The record is undisputed that Plaintiff first consulted his EEO counselor on October 30, 2020. Def.'s 56(a) ¶ 61; Pl.'s 56(a) ¶ 61. Thus, September 15, 2020 is the earliest date that Plaintiff can assert any discrete-act claims. Plaintiff's temporary reassignment to the Telemetry Unit on August 17, 2020, following the patient

mistreatment complaint, is clearly akin to a transfer or denial of transfer, and thus, it falls squarely within the realm of discrete acts as defined in *Morgan*. *E.g.*, *Roberts v. Sage Corp.*, No. 20-CV-365, 2021 WL 3617670, at *4 (N.D.N.Y. Aug. 16, 2021) (holding that "an undesirable removal from a specific assignment or one-time transfer to a new unit" is a discrete act that is "incapable of forming the basis of a continuing violation for a discrimination or retaliation claim"); *Kirkland-Hudson*, 665 F. Supp. 3d at 445–46 (collecting cases). Courts in this Circuit have also consistently categorized reprimands and negative performance reviews as discrete acts of discrimination, and not continuous violations. *E.g.*, *Edner v. NYCTA-MTA*, 134 F. Supp. 3d 657, 664–65 (E.D.N.Y. 2015) ("To the extent Plaintiff relies on Defendant's various reprimands or negative performance reviews, these are also discrete acts.").

Thus, both the April 5, 2020 reprimand and the August 17, 2020 transfer are discrete acts and are time-barred because they took place before September 15, 2020. *See Kirkland-Hudson*, 665 F. Supp. 3d at 445 ("Discrete acts 'are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" (quoting *Morgan*, 536 U.S. at 113)). However, to the extent that Defendant suggests that events prior to September 15, 2020 cannot be considered as evidence with respect to a timely discrimination claim, that is incorrect. As the Supreme Court has explained, the timeliness bar does not prevent a plaintiff "from using the prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Thus, even though the reprimand and transfer, as well as other events like the Filipino cultural party, took place before September 15, 2020, the court may consider them in connection with timely claims premised on discrete acts.

     B.   <u>Adverse Action</u>

The two timely discrete acts of alleged discrimination that took place after September 15, 2020, are Plaintiff's proficiency report on October 19, 2020, and the three-day suspension that Plaintiff served in January and February 2021. Defendant does not argue that the unpaid suspension is not an adverse action. *See* Def.'s Mem. of Law, ECF No. 26, at 16; *see also Timmer v. City Univ. of N.Y.*, No. 20-CV-2554, 2021 WL 3603465, at *5 & n.4 (E.D.N.Y. Aug. 13, 2021) ("Courts in this Circuit have found that suspensions without pay can be adverse employment actions.") (collecting cases). However, Defendant contends that Plaintiff's October 19, 2020 proficiency report, in which Plaintiff's rating for the subcategory of "interpersonal relationships" was lowered to "low satisfactory," is not an adverse action for the purposes of Title VII.

To state a claim under Title VII, a plaintiff must plausibly allege, *inter alia*, that he was subject to an adverse employment action. *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016). Prior to 2024, the Second Circuit defined an adverse employment action as "a *materially* adverse change in the terms and conditions of employment." *Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (emphasis added). However, in 2024, the Supreme Court decided *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), which held that Title VII does not impose a materiality requirement, *id.* at 973–74: A plaintiff "does not have to show . . . that the harm incurred was significant[,] serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 974. Instead, a plaintiff must only show that he suffered "*some* harm respecting an identifiable term or condition of employment." *Id.* (emphasis added); *see also Back v. Hapoalim*, No. 24-1064, 2024 WL 4746263,

at *2 (2d Cir. Nov. 12, 2024) (summary order) ("[T]he transfer must have left her worse off, but need not have left her significantly so." (quoting *Muldrow*, 144 S. Ct. at 977)).[4]

The Court finds that the October 19, 2020 proficiency report was not an adverse action because the record does not reveal that Plaintiff suffered *any* adverse consequences or harms from the lower evaluation in a subcategory as part of an overall satisfactory performance evaluation. Although the Supreme Court struck down any materiality requirement for Title VII, the Court emphasized that a plaintiff still must show "some harm" that they suffered as a result of the action. *Muldrow*, 144 S. Ct. at 974.  Plaintiff has not identified any evidence which might reveal that he suffered *any* consequences from receiving a lower rating in the subcategory of "interpersonal relationships" as part of an overall "satisfactory" performance report.  Rather, the record supports Defendant's characterization that this lowered rating was "gentle feedback couched in terms of a still-satisfactory subcategory rating."  Def.'s Mem. of Law, ECF No. 26, at 16.  "[E]ven under *Muldrow*, some workplace events that are unpleasant are not necessarily adverse employment actions.  For example, a 'mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment.'"  *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 91 (S.D.N.Y. 2024) (quoting *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024)).  Although the Second Circuit has not been confronted with this specific issue, several district courts that have examined similar job evaluations after *Muldrow* have determined that they do not qualify as adverse actions. *See Porter v. Dep't of Veterans Affs.*,

---

[4] Defendant's motion and opening brief was filed on April 1, 2024, several weeks before the Supreme Court's decision in *Muldrow* on April 17, 2024.  *See* ECF No. 26.  Plaintiff's opposition and Defendant's reply brief were both filed after the *Muldrow* decision, ECF Nos. 30, 31, but neither of those responses mentioned *Muldrow* or the impact of that decision.  Regardless, because the Court finds that Plaintiff has not satisfied the lower *Muldrow* standard either, additional briefing is unnecessary.

No. 4:23-CV-2 (BSM), 2024 WL 3402857, at *5 (E.D. Ark. July 12, 2024) ("The lower performance ranking was not an adverse employment action because Porter has not shown that it disadvantaged him."), *aff'd*, No. 24-2650, 2025 WL 274633 (8th Cir. Jan. 23, 2025); *Byrd v. Knox Cnty. Schs.*, No. 3:22-CV-373, 2025 WL 445253, at *4 (E.D. Tenn. Jan. 10, 2025) ("Without some effect on Plaintiff's terms or conditions of employment, a negative performance evaluation alone is not an adverse employment action."). *But see Turner v. Buttigieg*, No. 23-CV-1665, 2024 WL 4346332, at * (D.D.C. Sept. 30, 2024) (finding job evaluation where plaintiff was rated "exceeds expectation" instead of "outstanding" could meet the *Muldrow* standard for an adverse action).

Thus, because the October 19, 2020 proficiency report does not qualify as an adverse action under Title VII, it cannot form the basis of a discrimination claim.

### C.   Discriminatory Intent

The only timely adverse action that could sustain Plaintiff's discrimination claim is the three-day suspension that Plaintiff served on January 21, 2021, February 4, 2021, and February 16, 2021, following the conclusion of Maglione's fact-finding investigation.  In support of his motion for summary judgment, Defendant argues that the three-day suspension was solely related to the August 13, 2020 patient incident, and thus, Plaintiff has failed to show that the suspension occurred "under circumstances giving rise to an inference of discrimination."  Def.'s Mem. of Law, ECF No. 26, at 16 (quoting *Graham*, 230 F.3d at 39).  Plaintiff argues in opposition that his three-day suspension was related to the "animus" that Noyes and Maglione allegedly demonstrated in response to the Filipino cultural party.  *See* Pl.'s 56(a) ¶¶ 24, 35; Pl.'s Decl. in Opp'n, ECF No. 30, at 32–39, ¶¶ 28, 53, 55, 61.  The Court agrees with Defendant.

> While *Muldrow* clarified the "materially significant" element of proving an employment discrimination claim, it did not change the requirement that there be some evidence of discriminatory intent, which can come in many forms.  A plaintiff may, for example, rely on facts showing "the employer's criticism of the plaintiff's

performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*McBride v. C&C Apartment Mgmt. LLC*, No. 21-CV-2989 (DEH), 2024 WL 4403701, at *8 (S.D.N.Y. Oct. 1, 2024) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)). This case, perhaps laden with accusations and innuendo, is bereft of evidence from which discriminatory intent could be inferred. The record demonstrates conclusively that Plaintiff's suspension was discipline for the incident involving a complaint that he had mistreated a patient. There was no evidence of "invidious comments" about Plaintiff's national origin during that investigation or at any other time, or any other facts that would tend to support an inference that the resulting suspension was the result of discriminatory intent by Maglione or Noyes.

In opposition, Plaintiff relies on the events surrounding the Filipino cultural party to show that Maglione and Noyes harbored discriminatory animus towards him as a Filipino, which in turn led to his three-day suspension following the incident with the patient in August 2020. Of note, Plaintiff cites to the fact that when Dr. Jao and Munoz were discussing the upcoming party, Noyes had an "expression of dislike" on her face. Pl.'s 56(a) ¶ 24. Plaintiff points to the fact that neither Noyes nor Maglione attended the cultural party as evidence of their animus. *Id.* ¶ 31. Plaintiff also relies on two incidents to show discriminatory intent: (1) an alleged conversation between Noyes and Munoz on June 29, 2020, to which Plaintiff was not privy, in which Noyes allegedly instructed Munoz, a fellow nurse, to call Plaintiff and suggest that he cancel the cultural party, *id.* ¶¶ 25–26; and (2) a comment allegedly made by Maglione during a meeting with Plaintiff in connection with his proficiency report, where Plaintiff asked why he had received a lower rating, and Maglione allegedly responded, "You know what happened exactly to your party, right?" Pl.'s 56(a) AMF ¶ 56. Noyes, in her affidavit, denied that she asked Munoz to tell Plaintiff to cancel the party, but

admitted that she expressed to Munoz that she thought the party "didn't seem like a good idea." Noyes Aff., ECF No. 27-17, ¶ 3. And Maglione similarly denied in his affidavit that he ever mentioned the cultural party during the meeting with Plaintiff. Maglione Aff., ECF No. 27-16, ¶ 15. While this appears, at first blush, to create an issue of fact, the Court must determine whether the disputed fact is "material." That is, even if Maglione referenced the party during the meeting and Noyes thought the party should be cancelled, could a jury infer their discriminatory intent as motivating the three-day suspension? The Court answers this inquiry in the negative. At this juncture, it bears repeating that to defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *See Graham*, 230 F.3d at 38. Even if proven as Plaintiff has averred, no reasonable jury could find, absent impermissible speculation, that these incidents give rise to an inference of discriminatory animus; that is, that Maglione's and Noyes's reservations about, and reaction to, the cultural party stemmed from animus towards Plaintiff's national origin, and that such animus resulted in the three-day suspension arising out of the investigation into the August 2020 patient complaint.[5]

Plaintiff also relies on the disciplinary treatment of two other VA employees, Erin and Wirtz, as "similarly situated comparators" to show evidence of disparate treatment and therefore discriminatory intent. Pl.'s 56(a) ¶¶ 55–60. In order to make out a *prima facie* case for

---

[5] The Court also notes that the evidence is overwhelming that any such disagreement or concern over the party derived from the *perceived* exclusive nature of the event as opposed to any ethnic animus, even if such animus could be inferred (which it cannot). Maglione, Noyes, Wirtz, and LeFranc all independently testified that they understood the cultural party to be exclusive to Filipino nurses. Def.'s 56(a) ¶ 13. For instance, Maglione testified that he "recall[ed] hearing that the Filipino nurses were having this party for Dr. Jao, that only the Filipino nurses were invited," and that "one nurse who is Chinese told [him] he asked to go but was told the party is only for Filipino nurses." Maglione Aff. ¶ 6. Furthermore, in Noyes's conversation with Munoz, which Plaintiff heavily relies on, Noyes testified that she expressed her opinion that "Dr. Jao would not like being singled out based on her cultural background, and that Dr. Jao would want everyone to be invited." Noyes Aff. ¶ 3. Both Wirtz and LeFranc also each testified that they were upset that the party seemed exclusive to Filipino nurses. Wirtz Aff., ECF No. 27-18, ¶ 2; LeFranc Aff., ECF No. 27-20, ¶ 2. In fact, LeFranc testified that she had been explicitly told by another Filipino nurse that the party was exclusive to Filipinos, and thus, she could not attend. LeFranc Aff. ¶ 2.

discrimination by identifying comparators, a plaintiff must show that the comparator is "similarly situated" to themselves "in all material respects." *Flanagan v. Trader Joe's E., Inc.*, No. 3:21-CV-770 (VDO), 2024 WL 488008, at *5 (D. Conn. Feb. 8, 2024). The first comparator, Erin, was not disciplined for mistreating a patient, but instead, for testing positive for marijuana on a drug test. Pl.'s 56(a) ¶¶ 58–59. Although a comparator's conduct does not need to be identical to the plaintiff's, just "comparable," *Graham*, 230 F.3d at 40, a nurse violating an off-duty drug policy is not objectively similarly comparable to a nurse allegedly mistreating a patient while on duty. The second proposed comparator, Wirtz, was disciplined for accidentally overmedicating a patient, but unlike Plaintiff, Wirtz immediately self-reported her mistake and took responsibility for the incident.[6] Pl.'s 56(a) ¶ 57. Moreover, Wirtz was treated identically to Plaintiff when the incident came to light. In the immediate aftermath of both incidents, Wirtz and Plaintiff were both temporarily pulled from direct patient care and reassigned to the Telemetry Unit, pending a fact-finding investigation. Def.'s 56(a) ¶ 57.[7] It was only after the fact-finding investigation, during which Wirtz acknowledged her mistake and during which Plaintiff did not, that their discipline diverged. Wirtz received a reprimand while Plaintiff was temporarily suspended. Thus, no reasonable jury could find that Plaintiff was similarly situated to either Erin or Wirtz so as to give rise to an inference of discriminatory intent. *See Padilla v. Harris*, 285 F. Supp. 2d 263, 270 (D. Conn. 2003) (finding that a comparator was not similarly situated to the plaintiff because the "[p]laintiff had a five day suspension for client neglect," whereas the comparator had only received

---

[6] This is not to say that Plaintiff was required to "take responsibility for" or admit to the allegations against him. He was certainly within his rights to dispute the complaint, and he did so throughout the investigation. However, for the purposes of comparing the discipline he received to the discipline that proposed similarly situated comparators received, an employee's acknowledgement of responsibility is a relevant factor.

[7] Plaintiff disputes in his Rule 56(a) counterstatement that Wirtz was disciplined in this way, but he does not provide any countervailing evidence to contradict Wirtz's affidavit and testimony regarding the incident. *See* Pl.'s 56(a) ¶ 57.

"a reprimand for failure to report to work one day, with no evidence of any impact on client welfare").

Because Plaintiff has failed to establish a *prima facie* case of discrimination under Title VII, Defendant's motion for summary judgment on Count 1 is granted.

## II.    Count 2: Retaliation

Plaintiff also asserts a claim of retaliation under Title VII, alleging that the disciplinary actions taken against him were in retaliation for his EEO complaint and the organization of the Filipino cultural party.  Defendant seeks summary judgment on multiple grounds, but primarily challenges Plaintiff's ability to establish the requisite causal link between the EEO complaint and the disciplinary actions because there were legitimate, non-retaliatory reasons for the discipline.

Title VII makes it unlawful "for an employer to discriminate against any of [their] employees . . . because [they have] opposed any practice made unlawful by this subchapter, or because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Like discrimination claims, retaliation claims under Title VII are also analyzed using the *McDonnell-Douglas* burden-shifting framework.  *See Hicks*, 593 F.3d at 164.  To establish a *prima facie* case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Id.*  The plaintiff's burden at the first step is *de minimis* and "the court's role in evaluating a summary judgement request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)); *see also Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d

1219, 1224 (2d Cir. 1994) (holding that where direct evidence of an employer's retaliatory intent is absent, district courts must scrutinize the available evidence for circumstantial proof). Temporal proximity between a protected activity and an adverse employment action can establish a *prima facie* case of retaliation. *See, e.g.*, *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010), *abrogated in part on other grounds by Univ. of Tex. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Pistello v. Bd. of Educ., Canastota Central Sch. Dist.*, 808 F. App'x 19, 22–23 (2d Cir. 2020).

"The term 'protected activity' refers to action taken to oppose discrimination prohibited by Title VII." *Gaube v. Day Kimball Hosp.*, No. 3:13-CV-1845 (VAB), 2015 WL 1347000, at *3 (D. Conn. Mar. 24, 2015) (citing 42 U.S.C. § 2000e-3(a)). The prohibition against retaliation in Title VII "contains both an opposition clause and a participation clause," *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012), meaning that to qualify as engaging in a protected activity, plaintiff either must have "opposed any practice made an unlawful employment practice" by Title VII, or he must have participated in an investigation into unlawful employment practices. *Id.* (quoting 42 U.S.C. § 2000e-3(a)). Here, the only protected activity Plaintiff participated in was consulting with the EEO counselor on October 30, 2020. Def.'s 56(a) ¶ 61. There are simply no other actions taken by Plaintiff that could qualify as formal or informal complaints, protests, testimony, or other actions taken in opposition to an unlawful employment practice. *See Dotson v. City of Syracuse*, 688 F. App'x 69, 73–74 (2d Cir. 2017) (summary order) (collecting cases).

Notwithstanding, Plaintiff argues that throwing the Filipino cultural party itself constituted a protected activity. Pl.'s Ex. B, ECF No. 30, at 57–59. He is wrong. Simply promoting racial or ethnic inclusion for certain minority groups cannot qualify as a protected activity under Title VII because it is not an action taken in *opposition* to an unlawful employment practice. *See Brown v.*

*Xerox Corp.*, 170 F. Supp. 3d 518, 527 (W.D.N.Y. 2016) (holding that plaintiff did not engage in protected activity when he advocated on behalf of minority employees to receive promotions). Because the EEO complaint on October 30, 2020, was the first and only instance of Plaintiff engaging in protected activity, any allegedly adverse actions taking place before that complaint cannot support a Title VII retaliation claim. *See Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 104 (S.D.N.Y. 2023) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." (quotation omitted)). Thus, the only adverse actions that could be causally connected to Plaintiff's protected activity is discipline arising out of the August 2020 patient complaint, which occurred after Plaintiff met with the EEO counselor. *See Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 473–74 (S.D.N.Y. 2011) (finding that the initiation of disciplinary charges that resulted in suspension more than one year later constituted an adverse action under Title VII's retaliation provision).

Given the temporal proximity between the EEO complaint and this adverse action, the Court concludes that Plaintiff has adequately established a *prima facie* case of retaliation.[8] The first step in the disciplinary process that resulted in the Plaintiff serving the three-day suspension occurred on November 20, 2020, less than a month after Plaintiff filed his EEO complaint on

---

[8] Defendant argues that Plaintiff has failed to establish a *prima facie* case for retaliation because he did not prove that the EEO complaint was the "but-for" cause of the suspension. Def.'s Mem. of Law, ECF No. 26, at 23. However, because of the temporal proximity between the protected activity and the adverse action, at this stage, Plaintiff has met the *de minimis* burden of establishing a *prima facie* case and the first step of the *McDonell-Douglas* burden-shifting framework. Defendant cites the Second Circuit's decision in *Hale v. Vidal*, No. 22-2973, 2023 WL 7211909 (2d Cir. Nov. 2, 2023), which analyzed how a Title VII plaintiff must prove causation. But the district court in *Hale* found that the plaintiff had satisfied the first step of *McDonnell-Douglas*. The question facing the Second Circuit in that case was whether plaintiff had shown "at the *third* step that retaliatory intent was a 'but-for' cause of the [defendant's] actions." *Id.* at *1 (emphasis added). At the first step, the temporal proximity alone can support a *prima facie* case for retaliation under Title VII. "Although temporal proximity alone is insufficient to carry a plaintiff's *ultimate* burden to prove his case of retaliation, the 'but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity.'" *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 318–19 (E.D.N.Y. 2014) (emphasis in original) (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)), *aff'd*, 594 F. App'x 29 (2d Cir. 2015).

October 30, 2020.  The disciplinary matter continued until the final suspension was upheld by Montoya on January 11, 2021, and was served by Plaintiff in January and February 2021.

Defendant also contends that there were legitimate, non-retaliatory reasons for the suspension: namely, that the suspension was solely related to the patient incident that occurred on August 13, 2020, and that Plaintiff cannot, therefore, establish "but-for" causation.  The Court agrees.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 570 U.S. at 360. Thus, a plaintiff "alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Kwan*, 737 F.3d at 845.  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 846.  A plaintiff may establish but-for causation "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action," either alone or in combination with a showing of temporal proximity between the adverse action and the protected activity.  *See id.*

Here, Plaintiff does not dispute the broad strokes of the incidents that underlie the suspension.  Specifically, he admits the fact that a patient accused him of mistreatment, that Maglione met with the patient, investigated the incident, and gathered witness statements about what happened.  *See* Pl.'s 56(a) ¶¶ 27–30.  Further, he admits that in the factfinding investigation, Maglione met with Plaintiff and his union representative, and documented his version of events,

but that ultimately, Maglione believed the patient's version of events over Plaintiff's. *Id.* ¶¶ 32–33. Plaintiff does dispute, however, the patient's account of the events at issue. He further accuses Maglione of failing to "conduct a thorough, impartial and fair investigation." *Id.* ¶ 33. But resolving this dispute is unnecessary for the purposes of this motion. The undisputed record shows that: a patient complained about mistreatment at the hands of the Plaintiff; Maglione investigated the patient complaint; and Maglione ultimately credited the patient's version of events. *Id.* Plaintiff does not dispute that the suspension was a direct result of that investigation, even though he disagrees with the outcome. But Plaintiff's disagreement with the outcome, without more, does not suggest retaliatory intent. "The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification." *Miller v. Nat'l Assoc. of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010); *see also Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 232 (E.D.N.Y. 2014) ("Whether Defendants' actions were unreasonable, unfair or even untrue, . . . without any showing of retaliatory motive, they do not support Plaintiff's retaliation claim."). Nor does the temporal proximity assist Plaintiff in meeting his burden, as timing alone is not sufficient at summary judgment to impute a retaliatory animus or to create an issue of fact regarding pretext. *See El Sayed*, 627 F.3d at 933; *Hines v. Hillside Child.'s Ctr.*, 73 F. Supp. 2d 308, 324 (W.D.N.Y. 1999); *Mashal v. Royal Jordanian Airlines*, 837 F. Supp. 2d 884, 891 (N.D. Ill. 2011) ("Timing alone does not create a genuine issue of fact as to pretext if the plaintiff is unable to prove through other circumstantial evidence that she was terminated for a reason other than that proffered by the employer.").

On this record, there is no evidence by which a jury could conclude that the suspension would not have occurred in the absence of Plaintiff's complaint to his EEO counselor. Any

conclusion to the contrary would be rank speculation. Accordingly, there is no genuine issue of material fact as to whether Plaintiff's EEO complaint was the but-for cause of his suspension. It was not. Defendant's motion for summary judgment as to Count 2 is granted.

III.    Count 3: Hostile Work Environment

Hostile work environment claims under Title VII arise "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, the plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Id.* at 374. Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). In addition, "[a] hostile work environment claim requires more than just a hostile work environment—it requires proof that hostile acts were based on plaintiff's protected status (e.g., his [national origin]), rather than other reasons." *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 326 (D. Conn. 2014). A plaintiff bringing a hostile work environment claim under Title VII bears a heavy burden. *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 182 (S.D.N.Y. 2023).

Plaintiff relies on four incidents of alleged "verbal harassment" to support his hostile work environment claim: (1) Noyes's demeaning glances; (2) his encounter with Wirtz on August 9, 2020; (3) the staff meeting on August 13, 2020; and (4) his discussion with Mann about his schedule on August 24 and 27. Def.'s 56(a) ¶¶ 53–54. Plaintiff conceded in his deposition that after these incidents of "harassment," between January 1, 2021, and when he resigned on July 6, 2021, he "cannot recall being harassed" at work, and that he "stayed out of trouble." *Id.* ¶ 38.

These events, construed most favorably to Plaintiff, individually or in the aggregate, simply do not reveal a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. Not even close.

"Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)). Although Noyes, Wirtz, and/or Mann may have been rude or unprofessional, that is not sufficient to make out a case for hostile work environment. *See id.*; *e.g.*, *Freud v. N.Y.C. Dep't of Ed.*, No. 22-879, 2023 WL 3103588, at *3 (2d Cir. Apr. 27, 2023) (summary order) ("Even though [plaintiff's] allegations may reflect that his superiors were at times harsh, unjust, and rude, he has failed to allege sufficient facts to show that the complained of conduct created an environment that a reasonable person would find hostile or abusive." (quotations and alterations omitted)); *see also* *Alfano*, 294 F.3d at 374 ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness."). "Courts in this Circuit routinely dismiss hostile work environment claims at the pleading and summary judgment stage when predicated on similarly infrequent or seemingly mild episodes of alleged harassment." *Grande v. Hartford Bd. of Educ.*, No. 3:19-CV-184 (KAD), 2021 WL 231134, at *6 (D. Conn. Jan. 21, 2021) (collecting cases).

Defendant also argues that three out of four of the relevant incidents—the encounter with Wirtz, the staff meeting, and the discussions with Mann—are untimely because they took place before September 15, 2020, and that the only remaining timely incident—Noyes's alleged demeaning looks at Plaintiff—is insufficient to support a *prima facie* case for hostile work environment.  Def.'s Mem. of Law, ECF No. 26, at 27–28.

Unlike discrete-act discrimination claims, "[c]laims of a discriminatory hostile work environment are subject to the continuing violation doctrine because the 'very nature' of a hostile environment claim 'involves repeated conduct,' and 'incidents that give rise to a hostile work environment occur over a series of days or perhaps years and a single act of harassment may not be actionable on its own.'"  *King v. Aramark Servs. Inc.*, 96 F.4th 546, 559–60 (2d Cir. 2024) (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259–60 (2d Cir. 2023)).  Thus, the court must look at "the entire scope" of a plaintiff's claim.  *Freud*, 2023 WL 3103588, at *1 n.2.  "The [continuing violations] doctrine applies to claims composed of a series of separate acts that collectively constitute one unlawful practice and functions to delay the commencement of the statute of limitations period until the last discriminatory act in furtherance of that broader unlawful practice."  *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) (quotations omitted).  Thus, as long as one of the acts contributing to a hostile work environment claim takes place within the timely period, then the entire period of the hostile work environment may be considered.  *Morgan*, 536 U.S. at 117.

Assuming without deciding that Noyes's demeaning way of looking at Plaintiff, the only timely conduct cited, could be a contributing factor to a hostile work environment claim, the Court agrees that the other three events relied upon do not establish an ongoing practice of harassment so as to be actionable under the continuing violations doctrine.

Two of the untimely events (the encounter with Wirtz and the staff meeting) were related to fallout from the Filipino cultural party.  Plaintiff disputes the details of his confrontation with Wirtz on August 9, 2020, but he does not deny that it was about the cultural party.  Def.'s 56(a) ¶ 19; Pl.'s 56(a) ¶ 19.  Similarly, the staff meeting on August 13, 2020, only became confrontational because Dr. Jao brought up the perceived exclusivity of the cultural party.  Def.'s 56(a) ¶¶ 20–21.  But the remaining untimely event, the discussion with Mann, was not related to the cultural party at all: it was related to Plaintiff's new schedule after he was transferred to the Telemetry Unit due to the patient complaint.  *Id.* ¶¶ 42–43.  These three incidents do not reveal an ongoing practice of harassment against Plaintiff.  Indeed, each of these incidents involved different supervisors (Wirtz, Mann, and Dr. Jao), and the record is silent as to any other verbal harassment or "bullying" from them or any other VA employees.  *Id.* ¶ 54 (denying that there were any "other instances with Ms. Wirtz or other nurses where they called [plaintiff] a name or otherwise sort of verbally harassed [him] in this manner"); *id.* ¶ 53; *see Alfano*, 294 F.3d at 374 ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").  Further, there is also nothing to connect these time-barred episodes to Noyes's hostile facial expressions, which are the only timely acts that could serve as the basis for a hostile work environment claim.  *E.g.*, *Harris v. S. Huntington Sch. Dist.*, No. 06-CV-3879, 2009 WL 875538, at *11 (E.D.N.Y. Mar. 30, 2009) ("[T]he timely incidents . . . have nothing to do with the untimely acts of harassment, even assuming they were all motivated by [an improper purpose].").

Accordingly, Plaintiff has failed to establish a *prima facie* case for a hostile work environment.  Defendant's motion for summary judgment as to Count 3 is granted.

**Conclusion**

      For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 26) is granted on all counts.  The Clerk of the Court is instructed to enter judgment in favor of the Defendant and to close this case.

      **SO ORDERED** at Bridgeport, Connecticut, this 27th day of March, 2025.


                          */s/ Kari A. Dooley*_____
                          KARI A. DOOLEY
                          UNITED STATES DISTRICT JUDGE